Filed
June 22, 1990
William F. Clayton
Clerk

VJR

**UNITED STATES DISTRICT COURT**

DISTRICT OF SOUTH DAKOTA

DONALD J. PORTER
CHIEF JUDGE
413 U.S. COURTHOUSE
PIERRE, SOUTH DAKOTA 57501

CENTRAL DIVISION

June 22, 1990

*Page 44*

Michael Abourezk
Walford E. Eklund
JOHNSON, EKLUND & DAVIS
P.O. Box 149
Gregory, South Dakota 57533
Attorneys for Plaintiffs

Philip N. Hogen
United States Attorney
P.O. Box 1073
Sioux Falls, South Dakota 57102
Attorneys for Defendant United States of America

RE:  DENNIS HURST and JOYCE HURST, Plaintiffs
     vs.
     UNITED STATES OF AMERICA, Defendant
     CIVIL NO. 87-3018

Dear Counsel:

## MEMORANDUM OPINION

### I.  BACKGROUND

The Hursts brought this action, along with a pendent state-law claim against Don Hight[1], alleging that, under the supervision of the Army Corps of Engineers (Corps), Hight negligently constructed two jetties in a river channel, causing flooding on the Hursts' property.  The Court held that the government was immune to the Hursts' lawsuit because of the discretionary function

---

[1]  After a trial, the jury found Hight not liable on the state claim.

1

exception of the Federal Tort Claims Act (FTCA)[2], and dismissed the action.  On appeal, the Eighth Circuit held that the discretionary function exception of the FTCA does not apply to the Hursts' claim based on the alleged negligent failure of the Corps to comply with mandatory Corps regulations.  See Hurst v. United States, 882 F.2d 306, 310 (8th Cir. 1989).  The Eighth Circuit reversed the dismissal of the FTCA action and remanded for findings on the claim that the Corps caused the Hursts' damages by negligently failing to issue a prohibitory order.

## II.  FACTS

For a description of the facts of this case, see Hurst v. United States, 123 F.R.D. 319 (D.S.D. 1988) and Hurst v. United States, 882 F.2d 306 (8th Cir. 1989).

Both this Court and the Eighth Circuit have previously found that ample evidence exists indicating the Corps knew Hight was violating the permit issued to him; and the Eighth Circuit declared that the Corps violated its own regulations by failing to issue an

---

[2] Section 2680(a) provides that the FTCA is inapplicable to:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. 28 U.S.C. § 2680(a) (1988).

order prohibiting any further work by Hight on the project.[3]

## III.   DISCUSSION

The FTCA waives the sovereign immunity of the United States to allow suits for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1988).  Because the statute requires the Court to apply the law of the place where the act or omission occurred, South Dakota negligence law must apply in this case.

On remand, the Hursts argue that two separate theories of negligence support their claim for damages against the United States:  1) the Corps' failure to issue a prohibitory order when Hight's noncompliance with the permit was discovered constitutes negligence per se under South Dakota law, and 2) the Corps' failure to issue the prohibitory order constitutes negligence under the

---

[3]   The Corps' regulations which were in effect at the time of Hight's noncompliance with his permit state:

> When the district engineer becomes aware of any unauthorized activity still in progress, including a violation of the terms and conditions of an authorized activity, he shall immediately issue an order prohibiting further work, to all persons responsible for and/or involved in the performance of the activity and may order interim protective work.

33 C.F.R. § 326.2(a) (1984).

common law of South Dakota.

## DUTY OF CARE

Duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."  Prosser and Keeton, Law of Torts § 53 (5th ed. 1954). .The duty element of negligence could arise from either statutory or common law.  Walz v. City of Hudson, 327 N.W.2d 120, 122 (S.D. 1982).

### 1.  STATUTORY DUTY OF CARE

The Hursts argue that the Corps' failure to prohibit further work by Hight as mandated by the Corps' regulation constituted negligence per se.  In other words, the Hursts contend that the Corps' failure to issue a prohibitory order, in violation of the federal regulations, is negligence in and of itself.[4]

The government asserts that the reasoning in Gelley v. Astra Pharmaceutical Products, Inc., 610 F. 2d 558 (8th Cir. 1979), prevents the Court from finding negligence per se in this case.

---

[4]  The Eighth Circuit ruled that the Corps did breach a mandated duty under its own regulations:

> By its express terms, section 326.2(a) at that time imposed upon the Corps a nondiscretionary duty to issue a prohibitory order to Hight if the district engineer discovered a permit violation while the jetty project was still in progress.  The term 'shall immediately' stressed the urgency and mandatory nature of stopping the unauthorized activity before further violations occurred. . . . Ample evidence indicates that Corps employees knew of the permit violations but took no action as required by the regulation.

Hurst v. United States, 882 F. 2d 306, 309 (8th Cir. 1989).

4

The appellant in Gelley maintained that the United States Food and Drug Administration owed a duty to private individuals to ensure that drug manufacturers comply with applicable statutes. Appellant claimed that the government's duty arose under the federal Food, Drug & Cosmetic Act, and that the breach of that duty resulted in negligence. The court held that the FDA could not be held liable for a death from an adverse reaction to a drug because "Minnesota recognizes no private cause of action for violations of governmental duties owed the public in general, similar to those duties performed by the FDA." Gelley at 561. The government argues that the Hursts

> have failed to identify a single decision interpreting South Dakota law as imposing tort liability upon a governmental subdivision, or even an analogous "private individual", whose employee fails to issue a prohibitory order; or fails to properly inspect the work of another; or who, in a capacity other than as a landowner, insufficiently controls the conduct of a third party.

Even accepting this argument of the government as true, the Corps would still be liable under a negligence per se theory.

In South Dakota, under a negligence per se theory, the statute becomes the required standard of care of the ordinarily prudent person. See Albers v. Ottenbacher, 79 S.D. 637, 116 N.W. 2d 529, 531 (1962). The Restatement of Torts (Second) § 286, cited by the court in Albers, says that a court may adopt the standard of care required by a statute when that statute is found, exclusively or in part:

> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded,

and

(c) to protect that interest against the kind of harm
which has resulted, and

(d) to protect that interest against the particular
hazard from which the harm results.

The South Dakota Supreme Court has consistently followed a
negligence per se theory when faced with an unexcused violation of
safety statutes.  See Lovell v. Oahe Elec. Coop., 382 N.W. 2d 396
(S.D. 1986); Engel v. Stock, 88 S.D. 579, 225 N.W. 2d 872 (1975);
Grob v. Hahn, 80 S.D. 271, 122 N.W. 2d 460 (1963).  The court has
written:

> The violation of a statute or ordinance, designed for the
> benefit of individuals, is of itself sufficient to prove
> such a breach of duty as will sustain an action for
> negligence brought by a person within the protected class
> if other elements of negligence concur.  The statute or
> ordinance becomes the standard of care or the rule of the
> ordinarily careful and prudent person.  When the standard
> is thus fixed and its measure defined, the omission of
> that duty is negligence in and of itself.

Albers v. Ottenbacher, 79 S.D. 637, 116 N.W. 2d 529, 531
(1962)(motorist's brakes failed and he ran into the back of a car
stopped for a traffic light; motorist held in violation of a
statute regulating brakes on motor vehicles, and was negligent as
a matter of law) (citations omitted).

Governed by South Dakota law, the Corps will be liable under
a negligence per se theory if the Hursts were within the class of
persons meant to be protected by the federal regulation the Corps
violated.

The Corps in this case violated 33 C.F.R. § 326.2 which
requires the district engineer to issue a prohibitory order if he

or she discovers unauthorized activity.  In 33 C.F.R. § 326.3, the district engineer is directed that, upon discovery of unauthorized activity, an investigation shall be undertaken to determine:

> . . . whether as a result of the unauthorized activity, life, property or important public resources are in serious jeopardy and would require expeditious measures for protection.

33 C.F.R. § 326.3(b).  The section directs the Corps, while executing its duty to enforce permits, to be concerned with the lives and property of those who live near the site of the unauthorized activity.

Another section of the Corps' regulations governing issuance of permits for projects in navigable waterways also indicates that the Corps should be concerned with minimizing the risks of flooding on surrounding property:

> For those activities, which in the public interest, must occur in or impact upon floodplains, the district engineer shall insure to the maximum extent practicable that the impacts of potential flooding on human health, safety and welfare are minimized, the risks of flood losses are minimized . . . .

33 C.F.R. § 320.4(k)(2).

Finally, under 33 C.F.R. § 325.3(c), all adjoining property owners are to be given public notice of a permit application for a proposed project such as Hight's, and the Corps shall consider and balance a number of factors, including flood hazards, when issuing such a permit.  This, once again, indicates that the federal regulations governing the Corps include some protection for a certain class of persons -- those living near a waterway where there is a building project authorized by the Corps.

Because the Hursts were included in the class of persons meant to be offered some protection from flooding under the federal regulations governing the Corps, the Corps' failure to enforce its own regulations amounts to negligence per se under South Dakota law.

## 2.  COMMON LAW DUTY OF CARE

As an alternative to their negligence per se claim, the Hursts contend that the Corps' failure to issue a prohibitory order was a breach of a common law duty of care.  The Court must refer to South Dakota case law and determine whether it dictates that the Corps had a common law duty to issue a prohibitory order to Hight.

There are numerous South Dakota cases discussing general principles of tort law, and those can be relied upon as precedent and applied to the facts at hand.  In addition, there is no reason that the Court should ignore restatements, standards, and similar materials in order to reach a just result in this case.  As the Eighth Circuit stated in Passwaters v. General Motors Corp., 454 F.2d 1270, 1278 (8th Cir. 1972):

> . . . .[W]hen a federal court is faced with the problem of determining state law without decisions of the state directly controlling, the court may be guided by the law which in its opinion provided the most just and reasoned analysis.  See Wasik v. Borg, 423 F.2d 44, 48 (2 Cir. 1970); Putman v. Erie City Mfg. Co., 338 F.2d 911, 917-923 (5 Cir. 1964).

The Restatement of Torts is a source that the South Dakota Supreme Court has frequently relied upon in formulating rules of tort law.  See McElhaney v. Eli Lilly & Co., 564 F.Supp. 265, 269 n.11 (D.S.D. 1983).  The Restatement (Second) of Torts § 285

(1965) sets forth how a defendant's standard of conduct should be determined:

> The standard of conduct of a reasonable man may be
>
> > (a) established by a legislative enactment or administrative regulation which so provides, or
> >
> > (b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide, or
> >
> > (c) established by judicial decision, or
> >
> > (d) applied to the facts of the case by the trial judge or the jury, if there is no such enactment, regulation, or decision.

In this case, § 285(d) of the Restatement applies. There is no standard of obligatory conduct established by either statutory or case law in a situation substantially similar to the case at hand, and thus the Court must apply the facts of the case in order to determine the appropriate standard of care to which the Corps should be held.

According to South Dakota case law, "[a] noncontractual duty may be imposed by common law, statute, implication or operation of law, public policy, or from a failure to exercise that care which a reasonable person would exercise under like circumstances." F & M Agency v. Dornbush, 402 N.W.2d 353, 356-57 (S.D. 1987).

A recitation of certain facts of this case will illuminate this Court's finding that the Corps undertook to regulate the building of obstructions in navigable waters so as to, in part, avoid flooding; that the Corps had a duty to do so with reasonable care; and that it breached that duty.

On February 1, 1983, Hight applied to the Corps of Engineers

requesting a permit to perform erosion control work by constructing three jetties in the White River approximately one mile downstream from the Hurst property. The application, and the Corps' consideration thereof, was required by §404 of the Clean Water Act, 33 U.S.C. §1344 (1987), which the Corps administers in instances where dredged or fill material is to be placed into navigable waters.

On April 1, 1983, the Corps received a letter from Hurst stating his objection to the building of the jetties, including his concern that the jetties would create substantial risks of ice jams and flooding on his adjacent property. This letter was forwarded to the Hydrologic Engineering Division of the Corps of Engineers, Omaha District, which concurred with Hurst's objections and recommended denial of the application. The Corps' Omaha District Engineering Division concluded that the construction of two rather than three jetties in a slightly different location would not have a negative impact on the south bank where the Hurst property is located. On November 8, 1983, two Corps employees visited Hight at the project site to discuss the design of the jetties. At this meeting, an agreement was reached calling for Hight to build two jetties extending 30 feet from the high bank on the north side of the White River.

On January 13, 1984, Hurst received a letter from the Omaha district engineer advising him of Hight's revised plans and the Corps' analysis that the changes would result in a project with no significant impact on the downstream property. The engineer

10

assured Hurst that the project would be closely monitored to ensure that erosion problems did not develop and that the applicant had agreed to remove the jetties if any negative impacts became apparent.

On April 20, 1984, the Corps issued a permit to Hight, and he commenced construction of the two jetties.  Subsequently, Hurst called and wrote the Corps and informed them that Hight's work in progress was beyond that authorized in the permit.  On October 1, 1984, Corp of Engineer compliance inspector James Suedkamp visited the site and reported that Hight's work in fact did not correspond with the specifications of the permit.  At that time, Hight had completed jetty number 1 and had just begun construction on jetty number 2.  The Corps failed to issue an order prohibiting further work, though the federal regulations in effect at that time required such action.  See Hurst v. United States, 882 F.2d 306, 309 (8th Cir. 1989).  When Hurst again wrote and called the Corps protesting the continued violation by Hight of his building permit, the Corps responded by assuring him that the Corps would require Hight to comply with the permit.

On approximately November 14, 1984, the United States Fish and Wildlife Service informed the Corps that Hight had completely blocked the river with his project.  During an inspection of the site by the Corps on December 5, 1984, the following permit violations were discovered:  (1) the second jetty was constructed 460 feet downstream of the first jetty instead of 1400 feet as authorized; (2) the second jetty was 224 feet long (from the high

bank) instead of 155 feet as authorized; (3) a 240-foot-long temporary access road had not been removed and was acting as an extension of the second jetty; and (4) the channel excavation in the southern sandbar was about 1050 feet long and twenty-four feet wide instead of 400 feet by 100 feet as authorized. See Hurst v. United States, 882 F.2d 306, 308 (8th Cir. 1989).

In a December 12, 1984 letter to Hurst, the district commander of the Omaha district of the Corps wrote to Hurst about the violations, saying:

> Rest assured, I will pursue this matter and take those actions necessary to bring Mr. Hight's activities into compliance with the terms and conditions of his permit.

This letter was initialed by eight separate department heads within the Corps of Engineers.

On December 19, 1984, the Corps ordered Hight to remove the access road and deposit the fill above the ordinary high water line. According to Douglas Plack, a Corps engineer who worked on this project and testified at trial, this recommendation was made in order to minimize the possibility of an ice jam occurring. An inspection of the site by the Corps on March 27, 1985 revealed that the access road was no longer in place. However, the road had not been removed in accordance with the Corps' December 19, 1984 order to Hight. Rather than removing the access road and depositing the fill above the ordinary high water line, Hight broke up the road and allowed it to erode onto the adjacent areas in the streambed.

In February of 1985, Hurst retained a professional hydrologic engineer, Dr. Charles Baggs, in order to assess the potential

impact of the project as constructed with respect to the potential for flooding and ice jams.  Dr. Baggs submitted a report to the Corps concluding that the jetties would likely cause ice jamming and flooding.

In a May 15, 1985 letter, Dr. Baggs notified the Corps that his studies indicated the jetties would cause flooding either with or without the presence of the access road.  Dr. Baggs also informed the Corps that Hight had not complied with the interim work order requiring him to remove the roadway and place it above the ordinary high water line.  On August 19, 1985, the Hydrologic Engineering branch of the Corps issued a memorandum agreeing with the conclusions of Baggs, stating that flood waters could result "primarily due to the fact that the jetty blocks about 2/3 of the natural channel section."

No further action was taken by the Corps until after serious flooding occurred on the Hurst property occasioned by ice jams on the White River in February and March of 1986.  Then, on May 30, 1986, the Corps issued an amended permit approving the work done by Hight.

In their brief on remand, plaintiffs, the Hursts, argue that the Corps of Engineers had the duty to intercede and prevent Hight from over-building his project.  The general common law rule is that there is no duty to control the conduct of a third person in order to protect another person from harm.  Restatement of Torts (Second) §314; see also Abernathy v. United States, 773 F.2d 184, 189 (8th Cir. 1985).  However, there are exceptions to this rule.

The Restatement of Torts (Second) § 314, Comment D, provides:

> The rule stated in this Section applies only where the
> peril in which the actor knows that the other is placed
> is not due to any active force which is under the actor's
> control.   If a force is within the actor's control, his
> failure to control it is treated as though he were
> actively directing it and not as a breach of duty to take
> affirmative steps to prevent its continuance.

Section 315 of the Restatement recognizes exceptions to the general

rule when a special relationship exists between the person charged

with control and the person causing the harm.   The South Dakota

Supreme Court has considered sections 314 and 315 of the

Restatement of Torts (Second), see Erickson v. Lavielle, 368 N.W.2d

624 (S.D. 1985); Small v. McKennan Hosp., 403 N.W.2d 410 (S.D.

1987), and has recognized exceptions to the general common law rule

that there is no duty to control third persons.[5]

The Eighth Circuit Court of Appeals stated in Abernathy v.

United States, 773 F.2d 184 (8th Cir. 1985) that one of the chief

factors justifying imposition of liability for failure to control

the conduct of a third person when a special relationship exists

is "[t]he ability to control the person . . ."  773 F.2d at 189.

The court in Abernathy held that the defendant government agencies,

Indian Health Service and the Department of Social Services, did

not have sufficient control over an individual who beat another

---

[5]   The court in Lavielle quoted Prosser on Torts § 56 (5th ed.
    1954) at 379-80:

> Due to its apparent harshness . . . the old
> rule [Restatement § 314] has served chiefly as
> a point of departure; and very little extra is
> required for the assumption of the duty . . .

Lavielle, 368 N.W.2d at 627.

person to death to warrant imposition of liability for his violent act.

The Corps' responsibility was to decide whether to issue a permit for Hight's building project, and then to supervise his compliance with the permit, partly in order to ensure that the project would not increase the risk of flooding on surrounding land. A permit to build an obstruction in a waterway such as the White River can only be granted under the provisions of § 404 of the Clean Water Act, and can only be done so by the Secretary of the Army acting through the Corps of Engineers. 33 U.S.C. § 1344(a) and (d) (1987). The Corps not only had the authority to issue orders to Hight requiring his adherence to the permit specifications, but also had, under its own regulations, a non-discretionary duty to do so. The facts set forth previously in this memorandum reveal that the Corps did, at times, exercise its authority to control Hight's project, such as the order to Hight by the Corps to remove the access road that was blocking the river. The Corps had sufficient control over Hight concerning his building project to justify imposition of tort liability for its negligent failure to act, particularly in light of its mandatory duty under the circumstances shown.

## PROXIMATE CAUSE

Finally, in considering the merits of the Hursts' negligence claim, the Court must determine whether the evidence establishes that the Corps' negligent supervision of the Hight project, and its failure to issue the prohibitory order, was a proximate cause of

the damage to the Hurst property.[6]  "For proximate cause to exist, '[t]he harm suffered must be found to be a foreseeable consequence of the act complained of . . . . [T]he negligent act must be a substantial factor in bringing about the harm.'"  Leslie v. City of Bonesteel, 303 N.W. 2d 117, 119 (1981) (quoting Williams v. United States, 450 F.Supp. 1040, 1046 (D.S.D. 1978)).  Causation is ordinarily a question of fact.  Northwestern Bell Tel. Co. v. Henry Carlson Co., 83 S.D. 664, 165 N.W.2d 346 (1969).

The government contends that the flood was an act of God, due directly and exclusively to natural causes.  However, the evidence suggests otherwise.  Based on the evidence presented at trial, the Court finds:

-- Even if an ice jam occurred downstream from the jetties as the government claims, the jetties aggravated the effect of the ice jam and created a higher level of water and flooding than would have occurred without the jetties.  Plaintiff's expert witness, Dr. Charles Baggs,

---

[6]  The South Dakota Supreme Court has stated that:

The issues of whether the defendant owed a duty to the plaintiff and whether the defendant's conduct proximately caused the plaintiff's injury are, in effect, so interrelated that they are generally treated as one in the same.  Prosser, Law of Torts, p. 244 et seq. (4th ed. 1971).

Goff v. Wang, 296 N.W.2d 729, 730 (S.D. 1980).  The Court has already determined that the government breached a duty owed to the plaintiff in this case.  Although the court in Goff stated that the proximate cause issue may be "one in the same" with the duty issue, this Court will briefly address the issue of proximate causation.

testified at trial as follows:

Q:   Do you have a conclusion as to whether the
     jetties first of all would cause ice jams?

A:   Yes, I formed that conclusion and I state in
     my report that they would.

Q:   Secondly, regardless of whether the jetties
     cause ice jams or not, do you have an opinion
     as to if an ice jam, assuming that an ice jam
     formed anywhere in the area for any reason, do
     you have an opinion as to what effect the
     jetties would then have on the level of water?

A:   You mean, may I ask?

Q:   Yes. Go ahead.

A:   You mean if there were an ice jam say
     downstream from the jetties?

Q:   Right.

A:   Well, the jetties are what we call a hydraulic
     control.  They are a choke in the river and
     the stream no longer has its open cross
     sectional area that it had before, some 350
     feet wide and perhaps eight or ten feet deep
     to the bank.  It now has a cross section that's
     maybe 120 or 120 feet wide to go through, that
     is, with the roadway washed out even and a
     shallower depth because now the water has to
     go over to the south side where there's a
     sandbar to go over, an island and the flows
     that were normally accommodated by the channel,
     and the channel that was formed naturally by
     those flows is no longer accessible to it.  So
     to answer your question, the jetties would
     still cause a flood even without ice jamming
     directly upon them.

Q:   In other words, what you're saying is it
     doesn't matter whether the jetties caused the
     jam, if a jam occurs somewhere a flood is going
     to result because of the jetties?

A:   That's fair, yes.


-- Douglas Plack, an engineer working for the Corps of

Engineers who reviewed and made recommendations concerning Hight's permit application, was called at trial by Hurst to testify concerning his knowledge of the Hight project. Plack stated that the Corps, as a rule, does not allow jetties to extend more than one-sixth of the channel width into a river, and that he believed a 30 foot jetty built at Hight's proposed location would not cause problems. He met with Hight at the building site prior to construction of the jetties and Hight agreed to build jetties 30 feet in length. When Plack was presented at trial with photographs of the jetties actually constructed, he stated that the project looked nothing like the one he had discussed and agreed upon with Hight; a much larger structure was built. (T. 427-431).

-- The testimony of plaintiff's expert witnesses, Dr. Charles Baggs and Dr. Daryl Simons, is convincing. Dr. Baggs is a civil engineer with a specialty in river engineering. He is in private practice and is also on the research faculty of Colorado State University. He has many years of experience in engineering including 20 years in the Civil Engineer Corps of the United States Navy.

Baggs visited the jetty site in early February, 1985 and took measurements on the river, such as widths,

depths, slopes and flows, in order to determine what effect the jetties would have if an ice jam occurred. Though the temporary access road was still in place in February of 1985, and eroded somewhat before the flood, Baggs' calculations showed, and he concluded, that with an ice jam at that location there would be sufficient blockage with or without the roadway to cause an ice jam and flooding on the Hurst property.  (T. 109)

The government's expert witness, James Weubben, expressed disagreement with the cross-sectional studies and diagrams done by Baggs prior to the flood. Weubben's disagreement, however, cannot be given much weight because he did not examine the jetty site until two years after the flood, three years after Baggs did his cross-sectional studies.  In addition, Dr. Daryl Simons, an expert witness for plaintiff, testified that the river is an alluvial system, the banks and bottoms are subject to erosion, and therefore measurements taken before the flood would undoubtedly differ from measurements taken two years after the flood.  (T. 58-59)

-- Dr. Simons also testified as an expert witness for plaintiff.  He was hired by Hurst to review and do independent checks on Dr. Baggs' results. He visited the jetty site about one year after the flood occurred.  At the time of his testimony, Dr. Simons was doing work for

the Corps of Engineers.  He has a Master's Degree and a
Ph.D Degree in civil engineering with an emphasis on
river mechanics and the supporting sciences.  Dr. Simons
has published approximately 400 works pertaining to
engineering, including several articles about jetties and
three or four articles about ice problems.  At trial, he
stated his opinion, in part, as follows:

> [I]t's my opinion from my analysis that when
> you take a river cross section and reduce it
> to roughly one-quarter of its effective size
> by such construction, and in addition you not
> only have constructed it so that you've not
> only reduced it but you have raised the bed in
> that area that is open so the water and ice
> has to come and lift over it, that that is
> going to be a major culprit in causing ice
> jams and in my opinion it was the major factor
> that contributed to the magnitude of flooding.

(T. 194)


-- The government's expert witness, James Weubben, is a
civil engineer specializing in river ice hydraulics.  He
had been in practice with the U.S. Army Corps of
Engineers for twelve and one-half years at the time of
his testimony.  He testified that in his opinion the
jetties did not cause the ice jam because, based on the
photographs he saw and the people he talked to or heard
in court, "there appeared to be fairly continuous ice
from some distance downstream extending up to and through
the jetties."  (T. 709)  He also believed that the water
surface elevation downstream of the jetties was as high

or nearly as high as the water upstream, indicating it was not influenced by the jetties.  (T. 709)  Based on all of the evidence, including the photographs presented at trial, the Court finds that the expert testimony adduced by the plaintiff was more persuasive than that advanced by the government.  The photograph attached as Appendix A is one illustration of proof that the jetties caused the flood on the Hurst property.

-- The attached photograph, Appendix A [see Exhibit 84 in the Clerk's file], shows ice jammed against the face of jetty number 2 and being held back by the jetty.  As Dr. Baggs testified, the level of water appears to be lower below, or downstream from, the jetty as opposed to above, or upstream from, the jetty.  (T. 177).  This indicates that the flood was not caused by something downstream from jetty number 2 as the government contends.

-- In light of all of the evidence presented at trial, the Court finds that flooding on the Hurst property would have been minimal or nonexistent had the jetties been removed or had they been built according to the design initially authorized in the original permit issued by the Corps to Hight.

## IV.  CONCLUSION

The Hursts have proved, by a preponderance of the evidence, all of the elements necessary to establish their negligence claim against the Corps of Engineers.  The Corps owed the Hursts a duty of care, failed to perform that duty, and the Hursts' property was damaged as a result of the Corps' failure.  This is actionable negligence.

This memorandum constitutes the findings of fact and conclusions of this Court, on remand of the case by the United States Court of Appeals, Eighth Circuit, Hurst v. United States, 882 F.2d 306 (8th Cir. 1989).  The Court will, in a subsequent memorandum, fix the amount of damages to be awarded plaintiffs, the Hursts, against defendant United States.

BY THE COURT:

CHIEF JUDGE

[Insert photograph, Appendix A, here.]



JETTY NUMBER 2